**Jennifer J. Middleton**, OSB No. 071510
jmiddleton@justicelawyers.com
**Caitlin V. Mitchell**, OSB No. 123964
cmitchell@justicelawyers.com
JOHNSON JOHNSON LUCAS & MIDDLETON PC
975 Oak Street, Suite 1050
Eugene, OR 97401
Tel: 541-484-2434
Fax: 541-484-0882
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| MELINDA GITNES, | Case No.: 6:21-cv-01603 |
| Plaintiff, | |
| | **COMPLAINT** |
| v. | |
| | **Retaliation, 31 USC § 3730(h);** |
| NORTHWEST HOSPICE, LLC, dba | **Whistleblowing, ORS 659A.199; ORS** |
| Signature at Home – Signature Eugene | **659A.233; ORS 441.044** |
| Hospice; DR. TAREK NASHAWI, | |
| | **Demand For Jury Trial** |
| Defendants. | |

**PARTIES**

1.

Melinda Gitnes is a Nurse Practitioner living in Oregon.

2.

Northwest Hospice, LLC, dba Signature at Home – Signature Eugene Hospice

(hereinafter, "Signature Health") is an Oregon corporation based in Eugene, Oregon. It is a

component of "The Avamere Family of Companies," which operates multiple senior living and

rehabilitation facilities as well as home health entities. Signature Health serves as the staffing

Page 1 - **COMPLAINT**

agency for nursing staff for Avamere facilities and employs approximately 56 people who work in Avamere facilities.

3.

Dr. Tarek Nashawi is an internal medicine doctor who served as the Medical Director at Avamere Riverpark of Eugene, a 119-bed skilled nursing facility owned by Avamere. He was the sole physician assigned to the facility. During times relevant to this action, Dr. Nashawi was an employee of defendant Signature Health.

## JURISDICTION & VENUE

4.

Jurisdiction is proper under 31 U.S.C § 3730(h)(2) and 28 U.S.C. § 1331. Jurisdiction over related state law claims is proper pursuant to 28 U.S.C. § 1367(a).

5.

Venue is proper in the Eugene District of the District of Oregon because the acts and omissions at issue in this action occurred in Eugene.

## FACTUAL ALLEGATIONS

6.

Avamere Riverpark offers both skilled nursing beds and long-term care services. It is Medicare-certified, which means it is eligible to receive payment from Medicare. In order to maintain this Medicare certification and to receive payment, it has to follow detailed regulations about the care it offers to patients.

7.

42 C.F.R. § 483 sets out the requirements that an institution must meet in order to qualify to participate as a Skilled Nursing Facility (SNF) in the Medicare program, and as a Nursing Facility (NF) in the Medicaid program. If a facility does not meet these requirements, the facility

Page 2 - **COMPLAINT**

can be denied payment by Medicare or Medicaid, assessed monetary penalties, and can be denied

further participation in Medicare or Medicaid.

8.

In particular, 42 CFR § 483.30(c) requires that in order to maintain Medicare or Medicaid

certification, a resident must be seen by a physician at least once every 30 days for the first 90

days after admission, and at least once every 60 days thereafter. After the first visit, a physician

may alternate subsequent visits with a qualified nurse practitioner, but every other visit must be

done personally by the physician.

9.

42 CFR § 483.10(c) requires that patients be informed of and participate in their

treatment, including being informed in advance of any changes to the plan of care, being

informed in advance of the risks and benefits of proposed care or treatment, and being able to

choose the treatment option they prefer.

10.

42 CFR § 483.30(d) requires SNFs to have a physician available on call 24 hours a day.

11.

Medicare pays certified Skilled Nursing Facilities based on a per diem "prospective

payment system." Payment is a predetermined, fixed amount per eligible beneficiary that covers

most costs for the required care that the SNF must provide to the Medicare beneficiary.

12.

While physician services may in some cases be billed separately from the per diem,

prospective payments, the visits required by 42 CFR § 483 must occur for the facility to maintain

its certification and its eligibility for qualified payments under Medicare and Medicaid.

Page 3 - **COMPLAINT**

13.

When a Medicare-certified SNF like Avamere Riverpark bills Medicare for a beneficiary, it impliedly and/or expressly certifies that the beneficiary is receiving the full range of services that qualify it to participate as an SNF in the Medicare program (or a nursing facility in the Medicaid program), that it is fulfilling the requirements of 42 CFR § 483, and that it is therefore eligible to receive prospective payments for that patient.

14.

Defendant Signature Health hired Melinda Gitnes in January 2020 to be a Nurse Practitioner at Avamere's Riverpark facility in Eugene.

15.

On or about July 3, 2020, social worker Jody Kernutt emailed Melinda Gitnes and others to say that a patient needed to have a pre-discharge face-to-face visit completed, and there was no visit documented in his chart. Gitnes was off that day. When Kernutt sent the email, the nurse practitioner who worked that day, Kendra Ragan, had already left the facility for the holiday weekend.

16.

On July 5, 2020, Ragan responded to the email and said that she had not seen the patient for a face-to-face discharge visit, but that Dr. Nashawi had seen him for discharge purposes. On the same day, however, Ragan emailed to Gitnes the list of patients she said she had seen on July 3, and the patient's name was on the list. Gitnes looked at his chart, and Ragan had documented in the patient's chart that she had seen him in a face-to-face on July 3.

///

Page 4 - **COMPLAINT**

17.

Gitnes informed her supervisors, Laurel Ewing and Liz Johns, about the discrepancy. She

said she was concerned not only that it seemed as though the chart note was falsified, but also

that billing Medicare for any such visit would be Medicare fraud.

18.

Defendant Dr. Nashawi, the facility's medical director, had had a long working

relationship with Kendra Regan at Avamere Riverpark and other facilities. Within a few weeks,

defendant Nashawi began approaching staff in the facility and asking them if they had any

concerns or negative things to say about Gitnes.

19.

By August, 2020, Melinda Gitnes noticed that defendant Nashawi was ordering several

labs for patients without charting why he had ordered them. She therefore did not know what he

was looking for in the labs or if there was specific information that would be helpful to

communicate in reviewing them. She sent the lab results to Dr. Nashawi to review because he

had ordered them.

20.

Defendant Nashawi berated Melinda Gitnes for sending him labs. He told her to stop

sending them to him.

21.

Melinda Gitnes noticed other patient care problems from defendant Nashawi. He

discontinued medications for several patients without documenting why he had discontinued

them and without talking to the patient about why he was making the change. Patients came to

Melinda Gitnes upset with the changes.

Page 5 - **COMPLAINT**

22.

ORS 441.605(3) grants residents of long term care facilities the right to be "informed by

a physician of the medical condition of the resident unless medically contraindicated in the

medical record, and given the opportunity to participate in planning medical treatment."

23.

Melinda Gitnes also noticed that dozens of in-person doctor visits that Medicare required

had not been done. Many people had been in the facility for months without a single note from

defendant Nashawi in their patient chart, even though Medicare required a visit by the physician

at least once a month for the first three months. Some required visits were late by more than two

years.

24.

On September 24, 2020, Gitnes reported these patient care concerns to her supervisors

(Mandi Burrell-Chapman and Colleen Grimes at this point). She again pointed out that if

Avamere was getting paid for making sure these visits took place, it could be Medicare fraud.

25.

Gitnes also reported to Burrell-Chapman and to Grimes that Dr. Nashawi was refusing to

take call after hours for the facility, even though he was the only available doctor who was

supposed to be on call for the facility.

26.

On October 9, 2020, Burrell-Chapman and Grimes required Melinda Gitnes to attend a

meeting with them and defendant Nashawi. Melinda Gitnes calmly and professionally explained

to him some of the difficulties she was having with patients whose medications he had

discontinued without talking to them. Defendant Nashawi became agitated. He pulled his chair

up close to Melinda Gitnes and yelled at her. He said she was the worst Nurse Practitioner he had

Page 6 - **COMPLAINT**

ever worked with, pointed his finger at her and was extremely aggressive and demeaning.

Burrell-Chapman and Grimes did not respond or stop his aggression in any way.

27.

On October 12, 2020 Melinda Gitnes told the facility Administrator, Stacey Jones, about

defendant Dr. Nashawi's failure to perform the Medicare-required patient visits, his failure to

inform patients of their treatment or to document his decisions, and his treatment of her.

28.

Administrator Jones transmitted the reports to her supervisor at Avamere. She included

documentation of Dr. Nashawi's failure to see patients for the Medicare-required visits.

29.

Four days later, on October 16, 2020, Gitnes was called to a meeting and given a 'Code

of Conduct' corrective action notice. She was written up because she documented accurately in

patients' charts what defendant Nashawi had done or not done regarding their care. The

corrective action notice called this "undermining of [sic] the other provider's course of

treatment." The corrective action notice included a plan of follow-up meetings for several weeks,

into December.

30.

At the end of the corrective action meeting, Melinda Gitnes asked if anything was going

to be done about defendant Nashawi's treatment of her. Burrell-Chapman and Grimes agreed that

he had been inappropriate in the meeting on October 9 and that they should have stopped him.

Melinda Gitnes received no response to the substance of the concerns she raised about defendant

Nashawi's patient care or potential Medicare fraud.

Page 7 - **COMPLAINT**

31.

On October 21, 2020, defendant Nashawi emailed Burrell-Chapman and Grimes and

alleged that Melinda Gitnes was making unnecessary visits to patients and billing them to

Medicare.

32.

Signature immediately started a chart review in response to defendant Dr. Nashawi's

allegations. Dr. Nashawi added more claimed instances of allegedly fraudulent billing a week

later.

33.

On October 28, 2020, Signature Health placed Melinda Gitnes on administrative

suspension while it continued the investigation that defendant Dr. Nashawi had initiated.

34.

Melinda Gitnes complained to Avamere Human Resources that she was being retaliated

against for reporting patient care problems and potential Medicare fraud. On November 2, 2020,

she sent a report to Andrew Loomis, Avamere HR, and Elaine Rothstein, Signature HR, laying

out in detail what had happened.

35.

On November 10, 2020, Mandi Burrell-Chapman told Gitnes that the investigation

showed that she had not engaged in any fraudulent billing or documentation.

36.

Nevertheless, Signature Health terminated Gitnes that day. Documentation surrounding

the termination explains that Signature Health managers "are very concerned that Melinda

continues to call out what she believes to be errors in judgement/practice from the Medical

Page 8 - **COMPLAINT**

Director." Her termination letter stated that "performance issues around documentation . . . have

not been resolved to our satisfaction."

37.

Grimes also explained to Melinda Gitnes that she was being terminated because she had

reversed a medication change on a particular patient without discussing it with Dr. Nashawi first.

In Oregon, Nurse Practitioners have authority to order treatments and labs to manage medical

conditions, including the authority to prescribe or change medications and other treatments

independently. It was something Melinda Gitnes did in the facility nearly every day.

38.

On December 18, 2020, Melinda Gitnes filed a complaint with the Oregon Bureau of

Labor & Industries, which was revised on April 15, 2021 and amended on July 1, 2021. On

August 11, 2021 the Bureau of Labor issued a 90-day right to sue notice.

**FIRST CLAIM FOR RELIEF**
**False Claims Act – Retaliation**
**31 U.S.C.A. § 3730(h)**
**Against Signature Health**

Plaintiff repeats and realleges paragraphs 1 - 38 above as though fully restated herein.

39.

By reporting that numerous patients had not been seen by Dr. Nashawi or other providers

for their Medicare-required patient visits; that Dr. Nashawi was refusing to take call; that he was

not allowing patients to participate in their care or informing them of changes in their care; and

that billing Medicare or Medicaid for patient care in these circumstances could constitute fraud,

Melinda Gitnes undertook lawful acts to stop one or more violations of the False Claims Act, 31

U.S.C. §§3729 *et seq*.

Page 9 - **COMPLAINT**

40.

By the acts described above, defendants threatened, harassed, disciplined, suspended, discharged, and otherwise retaliated against Melinda Gitnes in the terms and conditions of her employment because of lawful acts she undertook to stop one or more violations of the False Claims Act, in violation of 31 U.S.C. § 3730(h).

41.

As a result of defendants' unlawful retaliation, Melinda Gitnes has suffered and continues to suffer lost income and benefits, loss of future earning capacity, and harm to her reputation and professional standing in amounts that are continuing to accrue and will be determined at the time of trial.

42.

As a further result of defendants' unlawful retaliation, Melinda Gitnes has suffered and continues to suffer emotional distress, loss of enjoyment of life, and other special damages. She is entitled to compensation for these damages in an amount to be determined by the jury at trial.

43.

Because of defendants' unlawful retaliation, Melinda Gitnes has incurred attorney fees and costs and other expenses in an amount to be determined at the time of trial.

SECOND CLAIM FOR RELIEF
Whistleblowing, ORS 659A.199
Against Both Defendants

Plaintiff repeats and realleges paragraphs 1 - 43 above as though fully restated herein.

44.

By reporting that numerous patients had not been seen by Dr. Nashawi or other providers for their Medicare-required patient visits; that Dr. Nashawi was refusing to take call; that he was not allowing patients to participate in their care or informing them of changes in their care; that

Page 10 - **COMPLAINT**

he was not documenting the reasons for his changes in care in their records; and that billing

Medicare or Medicaid for patient care in these circumstances could constitute fraud, Melinda

Gitnes reported information that she reasonably believed was evidence of a violation of law.

45.

By the acts described above, defendants threatened, harassed, disciplined, suspended,

discharged, and otherwise retaliated against Melinda Gitnes because she in good faith reported

information that she reasonably believed was evidence of a violation of law. In so doing,

defendants violated ORS 659A.199.

46.

Defendant Dr. Nashawi aided and abetted Signature Health's retaliation by berating

Melinda Gitnes, harassing her, verbally abusing her and falsely reporting that she engaged in

Medicare fraud, resulting in her termination, because of her reports. These acts violated ORS

659A.030(1)(g).

47.

As a result of defendants' unlawful retaliation, Melinda Gitnes has suffered and continues

to suffer lost income and benefits, loss of future earning capacity, and harm to her reputation and

professional standing in amounts that are continuing to accrue and will be determined at the time

of trial.

48.

As a further result of defendants' unlawful retaliation, Melinda Gitnes has suffered and

continues to suffer emotional distress and loss of enjoyment of life, and other special damages.

She is entitled to compensation for these damages in an amount to be determined by the jury at

trial.

Page 11 - **COMPLAINT**

49.

In taking the acts described above, defendants acted in reckless disregard of Melinda

Gitnes' federally- and state-protected rights. Punitive damages are appropriate to punish

defendant's acts and to deter such misconduct in the future.

50.

Because of defendants' unlawful retaliation, Melinda Gitnes has incurred attorney fees

and costs and other expenses in an amount to be determined at the time of trial.

### THIRD CLAIM FOR RELIEF
### Discrimination for Reporting Health Care Violations, ORS 659A.233
### Against Both Defendants

Plaintiff repeats and realleges paragraphs 1 - 50 above as though fully restated herein.

51.

In reporting that defendant Dr. Nashawi was not seeing patients as required by Medicare,

that he was neither talking to them about nor charting the reasons for his medical decisions such

as medication changes or labs that he ordered, and that he was refusing to take call; in

documenting his action or inaction in patient charts; and in reporting retaliation against her;

Melinda Gitnes reported in good faith possible violations of ORS Chapter 441. These included,

but were not limited to, possible violations of ORS 441.605; ORS 441.046; OAR 441-086-0200;

and ORS 441.044.

52.

Defendants harassed, disciplined, suspended, discharged, and otherwise retaliated

against Melinda Gitnes because of her reports, in violation of ORS 659A.233.

53.

Defendant Dr. Nashawi aided and abetted Signature Health's retaliation, in violation of

ORS 659A.030(1)(g).

Page 12 - **COMPLAINT**

54.

As a result of defendants' unlawful retaliation, Melinda Gitnes has suffered and continues to suffer lost income and benefits, loss of future earning capacity, and harm to her reputation and professional standing in amounts that are continuing to accrue and will be determined at the time of trial.

55.

As a further result of defendants' unlawful retaliation, Melinda Gitnes has suffered and continues to suffer emotional distress and loss of enjoyment of life, and other special damages. She is entitled to compensation for these damages in an amount to be determined by the jury at trial.

56.

In taking the acts described above, defendants acted in reckless disregard of Melinda Gitnes' rights and the rights of patients. Punitive damages are appropriate to punish defendant's acts and to deter such misconduct in the future.

57.

Because of defendants' unlawful retaliation, Melinda Gitnes has incurred attorney fees and costs and other expenses in an amount to be determined at the time of trial.

**FOURTH CLAIM FOR RELIEF**
**Retaliation for Complaints about Standard of Care, ORS 441.044**
**Against Both Defendants**

Plaintiff repeats and realleges paragraphs 1 - 57 above as though fully restated herein.

58.

As Medical Director for Avamere Riverpark, Defendant Dr. Nashawi was a person acting in the interest of a health care facility within the meaning of ORS 441.044.

Page 13 - **COMPLAINT**

59.

By providing nursing services to Avamere Riverpark, Defendant Signature Health was a person acting in the interest of a health care facility within the meaning of ORS 441.044.

60.

By disciplining and terminating Melinda Gitnes because of her reports of inappropriate care and violations of laws or rules, defendants violated ORS 441.044.

61.

As a result of defendants' unlawful retaliation, Melinda Gitnes has suffered and continues to suffer lost income and benefits, loss of future earning capacity, and harm to her reputation and professional standing in amounts that are continuing to accrue and will be determined at the time of trial.

62.

As a further result of defendants' unlawful retaliation, Melinda Gitnes has suffered and continues to suffer emotional distress and loss of enjoyment of life, and other special damages. She is entitled to compensation for these damages in an amount to be determined by the jury at trial.

63.

In taking the acts described above, defendants acted in reckless disregard of Melinda Gitnes' rights and the rights of patients. Punitive damages are appropriate to punish defendant's acts and to deter such misconduct in the future.

**PRAYER FOR RELIEF**

**WHEREFORE**, Melinda Gitnes requests that judgment be entered against defendants Signature Health and Dr. Tarek Nashawi, ordering that:

Page 14 - **COMPLAINT**

       a.        Melinda Gitnes be reinstated to her position with the same status that she would have had but for defendants' discrimination, or, in the alternative, front pay;

       b.        Melinda Gitnes be awarded two times her lost compensation with interest thereon pursuant to 31 U.S.C. § 3730(h), as well as compensation for all special damages sustained as a result of defendant's retaliation;

       c.        Melinda Gitnes be awarded punitive damages in an amount appropriate to punish and deter similar conduct; and

       d.        Melinda Gitnes be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C.A. § 3730(h)(2) and ORS 659A.885.

       Respectfully submitted this <u>3rd</u> day of November, 2021.

JOHNSON JOHNSON LUCAS & MIDDLETON PC

/s/Jennifer J. Middleton
**Jennifer J. Middleton**, OSB No. 071510
jmiddleton@justicelawyers.com
**Caitlin V. Mitchell,** OSB No. 123964
cmitchell@justicelawyers.com
975 Oak Street, Suite 1050
Eugene, OR 97401
Tel: (541) 484-2434
Fax: (541) 484-0882
Attorneys for Plaintiff